## Newberry's Administratrix, et al. v. Rhinehart.

(Decided June 16, 1914.)

### Appeal from Perry Circuit Court.

1. Estates—Decedents' Estates—Action for Settlement of—Claim Against—Evidence.—In an action against decedent's estate, record evidence, such as day book, ledger, bank pass book, etc., having no reference to any verbal statement of deceased, was competent.

2. Estates—Decedents' Estates—Action for Settlement of—Allowance of Claim.—In an action against decedent's estate, evidence examined and held that the claim in controversy is sustained.

WOOTTON & MORGAN for appellants.

H. C. FAULKNER & SON, MILLER & WHEELER, and HOGG & JOHNSON for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

R. C. Newberry died, intestate, in November, 1911, and, January following, his widow, as administratrix, and who is the appellant here, filed this action for a settlement and division of his estate. The appellee, Rhinehart, intervened with a claim that Newberry owed him $14,000. Issue was joined on this claim, and that is the only matter in controversy here.

Rhinehart's claim grows out of a partnership in which it is virtually admitted that Newberry kept all the books, received all money, made all deposits, and drew all checks on same. The partnership began October 19, 1909, and continued for about a year and a half, or until February 25, 1911. The business of the partnership was to take options on undeveloped coal lands for the purpose of sale. They took up quite a large body of land, and all that they sold seems to have been to one company, known as the Vizzard Investment Company. On their deal with the Vizzard Company they received approximately $145,-000, and on which there was a profit of $42,260.37. The dispute arises over a division of this profit. The lower court referred the case to a special commissioner. This commissioner, after hearing all the evidence, and going over all the books and papers, found that the estate of Newberry was indebted to Rhinehart in the sum of $10,-274.38. The report was confirmed, and judgment entered in Rhinehart's favor for that sum.

The articles of partnership as well as the dissolution were in writing.

Prior to forming the partnership with Newberry, Rhinehart was a member of the firm known as the North Fork Coal & Timber Company. This company, which also was a partnership, held options on a considerable body of land, but Rhinehart had bought out the interest of all other partners, so that on October 19, 1909, when he entered into partnership with Newberry, he was the sole owner of the North Fork Coal & Timber Company. The written articles of partnership between Rhinehart and Newberry stipulated that it was for the purpose of continuing the business of the North Fork Coal & Timber Company, and Newberry was to have one-fourth of the net profits, and Rhinehart was to have the other three-fourths, but it was provided that Newberry should not participate in any profits arising on sale of land held or taken up by Rhinehart, that is, the North Fork Coal & Timber Company, prior to October 19th.

In making the deal with the Vizzard Company it was necessary to put in about 800 acres in Perry County, known as the Babcock land, but this land cost the partnership $15.00 per acre more than they were getting per acre on the contract of sale with the Vizzard Company; in other words, there was a loss to the partnership on the Babcock land of $11,003.44. On February 25, 1911, when Rhinehart and Newberry came to write out articles dissolving the partnership, it was provided that the loss on this Babcock land should be borne by the two partners in proportion to their interest in the partnership, that is, Newberry should stand one-fourth of the loss. This loss had already been sustained and covered by the partnership, and the provision in the agreement of dissolution only affected a distribution of it on the books of the partnership; in other words, it was not an existing liability against the partnership. There were some outstanding liabilities on other accounts, and it was provided that these should be liquidated by Rhinehart. There is no contention that any of these other matters which Rhinehart was to settle are now unsatisfied, and in this way it appears that the only partnership matter undisposed of is the division of profits between the partners.

The dissolution agreement, among other things, provided that Rhinehart was to have all the office furniture, books, files, and records of the company, and Newberry transferred to him all his interest in any lands still held

or undisposed of, and any money due the partnership, and Rhinehart was to pay all outstanding indebtedness, except that Newberry's liability continued with Rhinehart on the warranty of titles to the Vizzard Company. As between the parties, the ninth article provided:

"They are to have and make a settlement of their partnership business and affairs, upon which settlement is to be ascertained the status of each of our accounts or indebtedness one to the other, and whatever said A. C. Rhinehart owes said R. C. Newberry, he agrees to pay him, and vice versa, whatever it is found that said R. C. Newberry owes said A. C. Rhinehart, he agrees to pay him. Said settlement to be made whenever it is convenient for us to make the same."

From the date of the dissolution in February, 1911, until the death of Newberry in November of that year, Rhinehart testifies that Newberry on three occasions admitted that he was indebted to him, and as often promised to go over the books, and figure out the amount and make settlement of it. On Friday preceding his death, Newberry promised that in a few days he would meet Rhinehart and make a settlement, but on Monday he was stricken with appendicitis, and never recovered, and hence no settlement was ever made.

Appellant's counsel strenuously objects to all of Rhinehart's testimony on the idea that it is concerning verbal statements made by one who is dead when the testimony is offered, and therefore comes within the inhibition of section 606 of the Civil Code. Of course, the testimony just referred to is incompetent for the reasons stated, but it was not hurtful, and we may disregard it. Appellant does not defend with a claim that there was any settlement made between the date of dissolution and Newberry's death. The articles of dissolution clearly show that there had been no settlement of the partnership accounts prior thereto. The other testimony of Rhinehart was the mere introduction of records, books, and papers. For instance, he put in evidence the option contracts for lands which the partnership sold to the Vizzard Company; the articles of partnership, and the dissolution signed by the partners; the day book and ledger, bank pass book, check book with stubs, and all paid and cancelled checks which were delivered to him at the dissolution. This being record evidence, and having no reference to any verbal statements of the deceased, it is competent, and so plainly so that citation of any more au-

thority than the last case on the subject is unnecessary, and that is Marcum v. Marcum, 154 Ky., 401. The check stubs, cancelled checks, and entries in the books are all in Newberry's handwriting. The bank pass book contains memorandum of deposits to the credit of the partnership of $141,310. The books of the bank show five additional deposits which were never entered on the pass book, and these make a total deposit to the credit of the partnership of $144,789.

During the whole period of the partnership the bank pass book was never balanced or posted; that is, the paid and cancelled checks were never entered or credited against the deposits. Paid and cancelled checks to the amount of $137,377 are in evidence. This should leave a balance in the bank of $7,412 to the credit of the partnership. Crediting Newberry with only his share on the profits of lands taken up by the partnership subsequent to October 19, 1909, and charging his portion of the loss on Babcock land, his books will show that he has overdrawn his accounts $2,929. This overdraft added to the apparent balance in bank to the credit of the firm makes $10,341, which is approximately the amount adjudged by the trial court to be due Rhinehart from Newberry, who was deemed the treasurer of the partnership. As a matter of fact there is no cash balance in bank. It has all been checked out, and the checks covering the apparent balance are unaccounted for. The bank cashier, a willing witness for Newberry, gives this testimony, and he also says that he "surrendered all cancellel checks to North Fork Coal & Timber Company." He does not explain why he did not take the precaution to enter them upon the pass book and square the account before surrendering possession of them.

In making his entries on the day book and ledger, Newberry ignores one very plain provision in the articles of partnership, and another provision in the dissolution. As before stated, the partnerhip articles denied to Newberry any interest in the profits from lands taken up before October 19th. In plain violation of this he credits himself on the books of the concern with one-fourth of these profits. In the dissolution it is stipulated that he should stand one-fourth of the loss on the Babcock land, but he charged the whole of it to Rhinehart. The evidence shows which lands were sold to the Vizzard Company, and from the date of the option contracts it is very

easy to see on which tracts Newberry was entitled to share in the profits. There is no dispute as to the amount of loss on the Babcock land, because Newberry entered it up in bold figures on the day book and carried it to the ledger. After paying for the lands, and every expense incident to the sale, including the loss on the Babcock land, there was in exact figures a profit of $42,-260.37. Taking the amount of profit and loss on each tract which entered into the sale, and entering it to the credit of Newberry and Rhinehart according to the terms of their two contracts, it shows that Newberry was entitled to $5,387.12, and Rhinehart was entitled to $36,-873.25. The books which Newberry kept show that Rhinehart received only $25,585.91; this is after subtracting the Babcock loss erroneously charged to him. From these books it will thus be seen that he is still entitled to receive $11,287.34. The judgment of the lower court in Rhinehart's favor was for $10,274.38. Figure over these books and papers as one may, and look at the transaction from any angle, keeping in mind the plain provisions of the partnership contracts, one cannot escape the conclusion that Newberry died indebted to Rhinehart in a sum not less than that adjudged by the court. If there was any error it was in not adjudging the indebtedness larger.

Appellant's objections on this appeal are technical; in fact, they present nothing as to the real merits of the case. We have already dealt with his objections to the testimony of Rhinehart. Another is the present condition of the books and accounts, and the conduct of the witness Richards with reference to them. Rhinehart seems to have attended to the outdoor business of the partnership; that is, he secured the options, looked after making surveys and abstracts. The bookkeeping and financing was left to Newberry, who was also engaged in merchandising. As to the state of the accounts, and Newberry's manner of keeping them, Rhinehart knew practically nothing. After Newberry's death he secured the services of Mr. Richards, an expert accountant, and turned over all the books and papers in his possession to Richards. Richards went through them with great care, and verified the pass book, and tabulated all the cancelled checks and compared same with the books of the bank; he traced the entries in the ledger back to the day book, and the various option contracts with the individual land owners.

In doing this he made lead pencil check marks, notes, and memorandum on the books, so that by reference to them he could explain such errors as he discovered. In this way he showed on the ledger, by lead pencil marks, correction of Newberry's entries, the loss on the Babcock land, and also his claim for profits in the sale of lands taken up prior to October 19th, in which he had no interest. Appellant insists that in this way Richards mutilated, distorted, and destroyed the books and accounts. We see no impropriety in anything done by Mr. Richards. Every mark he made upon the books is, as he says, in his own handwriting, with lead pencil, and is plainly distinguishable from the entries made by Newberry. There is no evidence that any figures or entries Newberry made have been changed or mutilated by lead pencil marks or otherwise. Richards has merely called attention to the fault or mistakes in entries made by Newberry. We see no reason for disturbing the judgment of the lower court, and it is, therefore, affirmed.